# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CAROLYN HOWARD,

        Plaintiff,

v.                                   Case No:  6:17-cv-1473-Orl-40GJK

RICHARD WILKINSON, RICHARD
LEBLANC, RYAN WILSON, JAMES
NELSON, JUAN PADILLA, PENELOPE
GRAY, NANCY MENDOZA, RODNEY
MARTIN, ANDREA DISTIN-CAMPBELL
and ORANGE COUNTY FLORIDA,

        Defendants.

_____/

## <u>ORDER</u>

William Howard was arrested and booked into an Orlando jail in late 2016 after a domestic incident. Shortly thereafter, he suffered a fractured neck when guards tackled him to the ground in his cell during a use of force incident, and he died the next day. Those events form the basis of this action. Now, Plaintiff Carolyn Howard,[1] individually and on behalf of Mr. Howard's estate, brings constitutional and state claims against Orange County (the "**County**"), five correctional officers, and four nurses for their actions contributing to Mr. Howard's death.[2]

---

[1]   Carolyn Howard is Mr. Howard's widow. (Doc. 1, ¶ 5).

[2]   The Complaint names the following County-employed correctional officers as Defendants: Richard Wilkinson, Richard Leblanc, Ryan Wilson, James Nelson, and Juan Padilla (collectively, "**Officer Defendants**" or "**Officers**"). (*Id.* ¶¶ 8–12). Likewise, the Complaint names the following County-employed nurses as Defendants: Penelope S. Gray, Nancy Mendoza, Andrea L. Distin-Campbell, and Rodney Martin (collectively "**Nurse Defendants**" or "**Nurses**"). (*Id.* ¶¶ 13–16). When mentioned

Each Defendant now moves for summary judgment, with the following motions, responses, and replies before the Court:

1. Defendant, Orange County's Motion for Summary Judgment (Doc. 77); Plaintiff's Response (Doc. 97); and Orange County's Reply (Doc. 102);

2. Officer-Defendants' Motion for Summary Judgment (Doc. 79); Plaintiff's Response (Doc. 95); and Officer-Defendants' Reply (Doc. 103);

3. Nurse-Defendants' Motions for Summary Judgment (Docs. 80–83); Plaintiff's Response (Doc. 96); and Nurse-Defendants' Reply (Doc. 104).

With briefing complete, the matter is ripe.

## I.      BACKGROUND

### A.      Pre-Use of Force

On November 16, 2016, William Howard, a seventy-five-year-old man, was arrested for aggravated battery with a deadly weapon against his wife. (Doc. 94, ¶ 1). Mr. Howard disclosed to medical staff numerous medical problems—including hypertension, asthma/COPD, high cholesterol, and glaucoma—when he was booked into the Orange County Jail (the "**Jail**"). (OCCHS 09645–49).[3] Medical staff commented that Mr. Howard

---

individually, separate Defendants are described as "**Defendant, Nurse, or Officer [LAST NAME].**"

[3]    Mr. Howard's Orange County Corrections medical records are identified as "OCCHS" followed by the five-digit Bates Number. The unredacted, sealed medical records are located at Docket Entry 100, and the redacted medical records are located at Docket Entry 89-3.

was disoriented so he was treated for psychotic symptoms. (*Id.* 09650–51). He was then taken to a "safe book"[4] cell and kept on suicide prevention status. (Doc. 94, ¶ 3).

On November 18, Dr. Leonard Branch evaluated Mr. Howard and found him "very confused and unable to answer questions in a reality[-]based manner." (OCCHS 09631–33). Mr. Howard rambled, acted as if he knew Mr. Branch when he didn't, and became visibly agitated by his continued detention. (Doc. 94-4, ¶ 4; OCCHS 09631–33). After the evaluation, Dr. Branch terminated Mr. Howard's suicide prevention status and placed him on psychological observation status. (Doc. 94-4, ¶ 5; OCCHS 09631–33).[5] That afternoon, Mr. Howard was forcefully moved from safe book to "a safety cell in the Acute Mental Health housing unit." (Doc. 94, ¶¶ 7–8).[6] During the move, day-shift correctional officers sprayed Mr. Howard with pepper spray (Oleoresin Capsicum Spray) because he was "combative." (*Id.* ¶ 6; OCCHS 09628).

Later that afternoon, at approximately 5:32 p.m., the nurse on shift for Mr. Howard's cell, Penelope Gray, LPN, entered a progress note stating that correctional officers had difficulty dressing him and could not move him from the safety cell. (OCCHS

---

[4]   A safe book cell is an empty, un-padded cell without a mattress. (Doc. 78-13, 100:21–102:8).

[5]   Jail staff are required to check in on detainees on suicide prevention status every fifteen minutes, and detainees on psychological observation status every thirty minutes. (Doc. 78-11, 35:22–36:6).

[6]   "Safety cells have padded walls, doors, and floors, no furniture or plumbing, and are typically used for those inmates that have suicidal tendencies." (Doc. 94, ¶ 9 (footnote omitted)). Safety cells are also known as suicide precaution cells. (*See, e.g.*, Doc. 78-5, 54:14–55:25).

09619, 09621).[7] When officers attempted to handcuff Mr. Howard for transport, he several times approached the food port to be handcuffed but would immediately pull his hands back before he could be restrained. (Doc. 78-4, pp. 5–6; Doc. 94, ¶ 18). Mr. Howard was also observed "feeling his way" around his cell for approximately three to four hours; Nurse Gray thought this was due to his glaucoma and being pepper sprayed. (Doc. 78-4, p. 5). Nurse Gray and two other medical staff members decided Mr. Howard should not be moved since he was "fine in [the safe cell] until he [was] ready to come out . . . he [was] safe . . . [and] there [was] no need to bring him out." (*Id.* at p. 6; Doc. 94, ¶ 19). Another nurse relayed instructions to night staff to not move Mr. Howard to another cell given his perceived reluctance to move. (Doc. 78-3, 59:10–60:13; Doc. 78-4, p. 6).

Night-shift staff then came in to replace day-shift staff. Corporal Padilla[8] was on duty; he supervised Officers Wilkinson, LeBlanc, Wilson, and Nelson that night. (Doc. 94, ¶ 20). Officer LeBlanc was told at the beginning of his shift that force was used on Mr. Howard earlier that day. (Doc. 78-5, 53:23–54:18). He tried speaking with Mr. Howard, which was unsuccessful, as Mr. Howard was "pacing around in the cell and talking— mumbling incoherently." (*Id.* 64:3–9). Officers Wilkinson and Padilla saw similar behavior when they checked on Mr. Howard. (Doc. 78-13, 112:8–113:3; Doc. 78-16, 34:22–35:8).

At some point, the decision was made to relocate Mr. Howard again. Officer Padilla testified that "it was relayed by mental health and medical staff, that we needed to move

---

[7]   Day-shift officers told Ms. Gray that Mr. Howard was "strong because an officer had to be sent [to] 911." (Doc. 78-4, p. 5). She later heard from another that "security staff was angry at Howard because he had ducked when they attempted to spray him with [pepper spray] and the spray hit three officers in the face." (*Id.*).

[8]   Cpl. Padilla reported to Sgt. Ransom, who in turn reported to Lt. Murray. (Doc. 94, ¶ 21). Neither Sgt. Ransom nor Lt. Murray are parties to this action.

him due to operational needs due to the – it was busy that day." (Doc. 78-14, 132:3–8). According to Officer Padilla, an influx of detainees was expected because of "some type of game" that night, and the safety cell "needed to be open." (Doc. 78-13, 108:5–9; Doc. 78-14, 132:9–13).[9] Specifically, Officer Padilla maintains that Nurse Martin told him that the safety cell needed to be available. (Doc. 78-14, 132:14–16).[10] Aside from mentioning Nurse Martin's purported statements, Officer Padilla did not identify which other "mental health and medical staff" sought removal of Mr. Howard from the safety cell. (*Id.* 139:3–7). Officer Padilla contends that he did not have "the final say as to whether operational needs dictate that . . . someone be moved." (*Id.* 131:14–24). Lt. Murray had the final say; Officer Padilla contends that Lt. Murray was consulted on the move but stopped short of saying that Lt. Murray approved. (*Id.* 131:14–132:8).

In anticipation of moving Mr. Howard, Officer Padilla requested that medical staff evaluate him again. (Doc. 78-13, 112:8–113:3). Mental Health Specialist ("**MHS**") Welch evaluated Mr. Howard and reported back to Officer Padilla that "he could be moved." (Doc. 78-5, 98:5–22; Doc. 78-14, 139:13–23).

---

[9] This account of events is cast in doubt by evidence that numerous safety cells were open and would remain open the evening in question. (Doc. 78-11, 34:19–35:11; Doc. 99-7, pp. 5–9).

[10] Nurse Rodney Martin refuted this assertion at his deposition. He said that he was "very concerned" about uses of force against Mr. Howard—which he knew took place once already that day—because he was "very elderly." (Doc. 78-7, 48:14–49:4). Nurse Martin understood that the Jail's policies might dictate moving Mr. Howard from the safety cell because he was off suicide prevention status. (*Id.* 55:13–56:13). However, Nurse Martin "did not want" Mr. Howard moved because of his mental state, the prior use of force, and concern that Mr. Howard would be injured if force was again used. (*Id.*). Nurse Martin maintains that he spoke to Officer Padilla "extensively" about his concerns with moving Mr. Howard. (*Id.* 57:8–22). They went "back and forth" on the issue, with Nurse Martin expressing opposition, until Officer Padilla ultimately said, "[H]e had to do what he had to do." (*Id.*).

## B.     Use of Force

Having resolved to move Mr. Howard, Officers first attempted a voluntary move. The Officers unsuccessfully tried to coax Mr. Howard toward the food port to be handcuffed. (Doc. 78-14, 154:25–155:9;  Doc. 94, ¶ 22). Because of his impaired vision, officers "bang[ed] [o]n the cell door" to guide Mr. Howard toward the noise to be handcuffed. (Doc. 78-14, 146:22–147:9).[11] These efforts were futile. A few times, he approached the door and touched the food port, but he did not put both hands through to be handcuffed. (Video 1; Willis Affidavit, Exhibit K ("**Video 2**")). In response to the Officers' requests to approach the food port, Mr. Howard at one point responded, "I've been through enough today." (Video 2).

After abandoning a voluntary extraction, Officer Padilla purportedly took time to plan a use of force action to move Mr. Howard. (Doc. 78-14, 173:8–19). Officer Padilla requested Officer Wilson assist in the use of force (Doc. 78-17, 35:4–10), and recruited Officer Nelson to operate a handheld camera to film the extraction, per Jail policy (Doc. 78-11, 54:11–55:4;  Doc. 78-14, 181:23–182:1).  Besides Officer Nelson recording, a camera attached to a stationary tripod recorded the events. (Doc. 94, ¶ 33).

Officers then put the plan into action. First, they tried one last time to convince Mr. Howard to approach the door to be handcuffed and warned that "force would be used" if he did not comply. (Video 1; Video 2). Next, Officer Wilson pepper sprayed Mr. Howard through the food port. (Video 1; Video 2). As they prepared to enter, Officer Padilla

---

[11] (*See also* Willis Affidavit, Exhibit J ("**Video 1**")).

instructed his Officers, "[O]pen it up, take him down, put him into prone, and let's get him secured." (Video 1; Video 2).[12]

The Officers then entered the cell, and a flurry of action ensued.[13] Upon entry, Mr. Howard was huddled in the corner with his head physically touching the cell wall and his arms down. (Video 1; Video 2; Willis Affidavit, Exhibit H ("**Video 3**")). Officers LeBlanc, Wilson, and Wilkinson grabbed Mr. Howard, holding the back of his neck and each arm. (Video 1; Video 2). Mr. Howard grunted and moaned as Officers alternately yelled "don't move" and "put your arms behind your back." (Video 1; Video 2). After a brief struggle,[14] one Officer said "takedown," and Officer Padilla repeatedly instructed "put him into prone." (Video 1; Video 2). Then, the Officers spun Mr. Howard toward the front of the cell and slammed him headfirst into the ground, with Officer LeBlanc riding on Mr. Howard's back

---

[12] Officer Padilla maintains that he took ten minutes to plan and "[f]ive to ten minutes to instruct" the other Officers on the plan. (Doc. 78-14, 173:8–19). The videos, however, do not capture this alleged five- to ten-minute instruction, and Officer LeBlanc testified that all of the Officers' discussions regarding the planned use of force were "on video tape." (Doc. 78-5, 114:6–8).

[13] A total of five Officers participated in the use of force. Officer Nelson filmed. (Doc. 94, ¶ 33). Officers LeBlanc, Wilson, and Wilkinson took part grabbing Mr. Howard, getting him on the ground, handcuffing him, and carrying him out of his cell. (Video 1; Video 2). Officer Padilla gave instruction and helped carry Mr. Howard out of his cell. (Video 1; Video 2).

The Officers using force were substantially larger than Mr. Howard. Mr. Howard weighed 187 pounds at the time. (OCCHS 09631). Officer LeBlanc was 6'1" tall and weighed about 200 pounds. (Doc. 78-5, 53:18–22). Officer Wilkinson was 5'8" tall and weighed about 245 pounds. (Doc. 78-16, 28:24–29:3). Officer Wilson was 5'8" tall and weighed about 230 pounds. (Doc. 78-17, 34: 24–35:3). Officer Padilla was 5'9" and weighed about 240 pounds. (Doc. 78-13, 79:6–10).

[14] The nature of Mr. Howard's "struggle" is not facially apparent. Officer LeBlanc testified that Mr. Howard resisted being handcuffed "by tensing his muscles and attempting to pull away from our grasp." (Doc. 78-5, 118:2–5).

throughout the takedown,[15] and straddling Mr. Howard once he was on the ground. (Video 1; Video 2; Video 3). Officer LeBlanc then handcuffed Mr. Howard. (Video 1; Video 2). While on the ground, Mr. Howard can be heard coughing, wheezing, and saying "I'm dead. I'm dead." (Video 1; Video 2).

Next, Officers moved Mr. Howard out of his safe book cell. While he continued coughing and wheezing, Officer Padilla directed the others to "assist him to his feet." (Video 2). With Mr. Howard's head hanging limp, Officers LeBlanc and Wilkinson propped him up with his knees touching the floor and torso held upright by Officers. (*Id.*). One of the Officers instructed Mr. Howard to "get up" and walk to a new cell. (*Id.*). Mr. Howard did not respond to this command, and his head and body remained limp. (*Id.*).[16] Seconds later, Officer Padilla ordered Officer Wilson to "grab the legs." (Video 1). Then the Officers each grabbed an extremity and carried Mr. Howard's limp body—neck dangling from his shoulders—to a new cell a short walk down the hall. (*Id.*). There, Officer Padilla instructed Officers to "place him into prone." (*Id.*). The Officers put Mr. Howard face down on the floor, removed his pants and handcuffs, and left Mr. Howard naked on the cell floor with his hands still behind his back. (*Id.*). On their way out, Officer Padilla congratulated the others, "Good job." (*Id.*).

---

[15] Officer LeBlanc testified that he "attempted to use an armbar takedown." (Doc. 78-5, 104:14–22).

[16] Officer Padilla characterized Mr. Howard's refusal to stand up and walk to his new cell as continued and "escalated resistance." (Doc. 78-14, 246:18–247:14). He also opined that Mr. Howard was able to stand at the time "[b]ecause he was talking." (*Id.* 247:15–23; *see also* Doc. 78-5, 130:8–11; Doc. 78-17, 61:19–62:1).

Laying face-down and naked on the cell floor, Mr. Howard was motionless for about five minutes. (Video 2). When Officers returned with medical staff, he was in the same position that he was left in, except his left hand had moved slightly. (*Id.*).

### C. Post-Use of Force Until 6:00 a.m. November 19

Nurse Mendoza, who was assigned to supervise Mr. Howard's cell, was the first medical staff to visit Mr. Howard after the use of force. (Doc. 78-7, 38:4–10; Video 2).[17] Officers asked Mr. Howard to approach the door to be restrained so he could be medically evaluated and decontaminated following the use of pepper spray. (Doc. 78-9, 42:13–16, 79:5–80:6; Video 2). Mr. Howard told them he could not use his legs or stand up, so the Officers and Nurse Mendoza walked away. (Doc. 94, ¶ 51; Video 2). A few minutes later, Nurse Mendoza returned with her supervisor, Nurse Martin. (Video 2). When Officer Wilson asked if Nurses Martin and Mendoza wanted to go into Mr. Howard's cell for an evaluation, Nurse Martin replied "No, no. Wait and see what happens. He's moving the upper part of his body." (*Id.*). Later, Nurse Martin asked Mr. Howard how he felt, to which he replied "I can't get up." (*Id.*). Nurse Mendoza was present for this exchange. (*Id.*). At one point, an officer walked into the cell, asked Mr. Howard if he wanted food, and left after Mr. Howard refused. (*Id.*).

Nurse Mendoza later testified that she observed Mr. Howard breathing regularly during her visual observation. (Doc. 78-9, 40:6–11). She also maintains that he was moving his "arms and legs, feet and hands[, a]ll extremities" without difficulty. (*Id.* 41:6–17). The Court pauses briefly to note that Video 2 paints a starkly different picture, in

---

[17] Nurse Mendoza also evaluated Mr. Howard minutes before the use of force and reported that he was "talking to [him]self, restless," and "pacing." (OCCHS 09616).

which Mr. Howard does not move his legs whatsoever, and he struggles to move his arms after lying motionless for several minutes.[18] At one point, an Officer standing next to Nurse Mendoza encouraged Mr. Howard, "[M]ove your legs to get up." (Video 2). Mr. Howard responded, "I can't," and the video clearly depicts his motionless legs between Nurse Mendoza and another Officer. (*Id.*). For three minutes, Nurse Mendoza watched Mr. Howard try to get up or roll over without moving his legs. (*Id.*).

Nurse Martin would testify that he was concerned for Mr. Howard's welfare and "tr[ied] to find a reason to – to send him to the hospital, so – but there were no injuries, nothing actionable." (Doc. 78-7, 77:4–9). Nurse Martin concluded that his visual assessment "was sufficient," though he acknowledged that certain injuries are not identifiable from a visual inspection. (*Id.* 78:3–79:21). Neither Nurse Martin nor Nurse Mendoza conducted more than a visual inspection of Mr. Howard (or even go into his cell) that night despite his explicit complaints that he could not move his legs and watching him lay nearly motionless on a concrete floor minutes after a use of force event. (Video 2).

After the group walked away, Mr. Howard can be seen struggling to turn over— which he just barely accomplishes—using only his arms. (*Id.*). The camera on the tripod stopped recording a few minutes after the Nurses and Officers walked away. (*Id.*). In the approximately thirty-minute span of time in which the tripod recorded the new cell, Mr. Howard's legs do not appear to move and Mr. Howard only manages to roll over from a prone to a supine position. (*Id.*).

---

[18]  Video 2 also captures the entirety of Nurse Mendoza's and Martin's evaluation—and indeed the only "medical evaluation"—of Mr. Howard between the November 18 evening use of force and the morning of November 19. (Doc. 78-5, 133:22–134:11).

In the succeeding hours, regular cell checks continued but little changed. Officers LeBlanc and Wilkinson checked on Mr. Howard every thirty minutes until their shifts ended at 6:00 a.m. on November 19. (Doc. 78-5, 134:9–11; Doc. 78-16, 94:9–17). They observed that Mr. Howard remained on his back on the concrete floor where Officers left him for the rest of their shift. (Doc. 78-5, 134:15–24; Doc. 78-16, 95:3–6). Likewise, Nurse Mendoza made repeated checks of Mr. Howard that night and did not observe him sit up or stand, rather he remained in a supine position all night. (Doc. 78-9, 53:16–54:6).

### D.    November 19 Events

Nurse Mendoza entered a 6:09 a.m. progress note on November 19, 2016, saying:

Patient remains lying on floor. Medical and security have made numerous attempts to encourage patient to get in bed. Patient refuses to move off of floor. Patent continues to roll side to side on floor. Patient able to move both upper and lower extremities. Patient able to respond when addressed by staff. Patient refused breakfast. Security staff continues to encourage patient to get up and eat; patient continues to refuse. Patient continues to refuse all help from medical staff. Patient continues to refuse medication.

(Doc. 94, ¶ 55).

Nurse Gray interacted with Mr. Howard during her November 19 day shift.[19] That morning, Nurse Mendoza told Nurse Gray that Mr. Howard was forcefully moved the night prior. (Doc. 78-3, 66:17–67:10). When Nurse Gray visited Mr. Howard's cell to give him medication, he "was laying on the floor naked" still in a supine position. (*Id.* 69:10–71:2; OCCHS 09611). Nurse Gray saw that Mr. Howard had to be lifted by corrections officers from the floor into his bed and needed officers to hand him a sandwich that he could not reach because it was three feet away. (Doc. 78-3, 74:24–76:10; Doc. 94, ¶ 60). Mr. Howard reyated to Nurse Gray that he "hurt all over" and complained of neck pain. (Doc.

---

[19]   It bears re-stating that Nurse Gray saw and expressed concern for Mr. Howard on November 18. *See supra* p. 4.

78-3, 77:7–13, 85:1–14). Nurse Gray testified at her deposition that, once in bed, Mr. Howard was able to move his legs "back and forth." (*Id.* 77:7–13).[20] She also checked his vital signs, which appeared to be normalizing. (*Id.* 95:16–96:13). During her twelve-hour November 19 shift, Nurse Gray did not observe Mr. Howard stand up or even sit up without assistance. (*Id.* 97:9–11). In a nurse progress note entered at 5:51 p.m., November 19, Nurse Gray reported that Mr. Howard was still laying in his bunk and continued complaining of neck and back pain. (Doc. 94, ¶ 63; OCCHS 09607).

At approximately 7:00 p.m. that evening, Nurse Distin relieved Nurse Gray (who had already left) of her post overseeing Mr. Howard's cell in the acute mental health ward. (Doc. 78-1, 22:6–13; 24:16–17). According to Nurse Distin, she was briefed on day-shift happenings by Nurse Martin, mentioned no uses of force against Mr. Howard or his condition generally. (*Id.* 27:15–28:16). When Nurse Distin approached Mr. Howard's cell for the first time, she saw him laying on his back and learned that he "wasn't going to get up to the door." (*Id.* 24:21–23). A nurse progress note entered by Nurse Distin states:

> Patient is supine on his bunk. Asked patient to sit up to take his medication and receive his eye drops. Patient assisted to sitting position by correct[ions] staff. Patient states that he can't sit up on his own or move his legs. . . . Moves bilateral upper extremities[] freely. Denies any pain. [Nurse Martin] updated on patient complaints.

(Doc. 94, ¶ 65; OCCHS 09605). Nurse Distin apparently did not take immediate action to address Mr. Howard's complaint that he could not move his legs, instead opting to simply relay the complaint to her supervisor. (Doc. 78-1, 37:14–38:1).

---

[20] In a nurse progress note time-stamped 11:36 a.m., November 19, Nurse Gray documented that Mr. Howard was cooperative, drank "a large cup of detox drink," and complained of wrist, neck, back, and elbow pain. (OCCHS 09609). She also noted that he "sat up with assistance, and immediately asked to lay down [because] his back hurt." (*Id.*).

At approximately 10:00 p.m., Nurse Distin found Mr. Howard unresponsive in his cell. (Doc. 94, ¶ 66). He was taken to the hospital by ambulance and died the next morning. (*Id.* ¶¶ 66–67). The medical examiner classified Mr. Howard's death as a homicide and concluded that it was "the result of hypoxic encephalopathy due to a neck fracture with cervical spinal cord trauma, which was due to blunt force." (Doc. 99-6, p. 4).

Following an investigation, Dr. Robert J. Buck, III, the County's Corrections Health Services Department Medical Director, disciplined Nurses Gray and Mendoza by written reprimand for violation of Jail policies and failing to document and follow through on patient care. (Doc. 78-21, ¶¶ 12–13; Doc. 94, ¶ 68). Dr. Buck fired Nurse Martin for similar reasons. (Doc. 78-21, ¶ 14; Doc. 94, ¶ 69).

After uses of force, Jail policy requires medical staff to "conduct an assessment of the inmate involved . . . and provide treatment as possible." (Doc. 99-3, 10:3–25, 11:12–18). Where a neck injury is suspected, Jail policy dictates (and the Nurse Defendants' education instructs) that the suspected-injured neck be supported to "avoid lateral head movement." (*Id.* 49:2–6; *see also* Doc. 78-7, 30:6–24). Known or suspected neck injuries are considered medical emergencies, that under Jail policy require special treatment. (Doc. 99-3, 51:6–52:21). A "medical emergency" can be declared by a patient, officer, or nurse, setting in motion additional evaluations and protocols for the possibly-injured patient. (*Id.* 52:2–21).

### E.  Procedural History

On August 10, 2017, Mr. Howard's family members sued individually and on behalf of his estate. (Doc. 1). The Complaint proceeds in thirteen Counts. Counts I through IV allege 42 U.S.C. § 1983 claims for excessive use of force against the Officer Defendants

(besides Defendant Nelson). Count V brings a § 1983 excessive force claim against Defendant Nelson—who filmed the use of force incident—premised on Defendant Nelson's failure to intervene. Counts VI through IX assert § 1983 claims against the Nurse Defendants for their deliberate indifference to Mr. Howard's serious medical needs. Count X alleges a municipal liability claim against Orange County, Florida, for delegating final policymaking authority to the Nurse Defendants. Counts XI through XIII aver wrongful death claims against Orange County premised on (XI) battery, (XII) negligent hiring and retention, and (XIII) negligence.

Then, all Defendants moved to dismiss. (Docs. 23, 41, 44). The Court dismissed the individual claims asserted by Heidi Haye, Sonya Smith, and William Howard, Jr., but otherwise denied the motions. (Doc. 60). All Defendants again seek to prevail on Plaintiff's claims, this time by summary judgment motions.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome under governing law. *Id.* The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

The moving party bears the initial burden of identifying those portions of the record demonstrating the absence of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows there is insufficient evidence to support the non-moving party's case, the burden then shifts to the non-moving party to demonstrate there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Also, "[t]he court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam).[21] In cases involving video evidence, such as this one, the court is "required to view the facts in the light depicted by the video even if [the plaintiff's] allegations contradicted its depiction." *Mathis v. Adams*, 577 F. App'x 966, 968 (11th Cir. 2014) (per curiam).

A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), so "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant

---

[21] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996).

## III.     DISCUSSION

### A.     Officers' Motion for Summary Judgment

Defendant Officers Wilkinson, LeBlanc, Wilson, Nelson, and Padilla jointly move for summary judgment based on qualified immunity. (Doc. 79). The motion begins on a conciliatory note, stating that it is brought "cautiously" in light of the Court's "strong language" in the earlier Order denying motions to dismiss. (*Id.* at p. 2). But this assurance turned out to be little more than a fig leaf, as the Court discovered upon reviewing the evidence and Defendants' motion, which is due to be denied.

> *1.     Qualified Immunity as to Officers Wilkinson, LeBlanc, Wilson, and Padilla*

Officer Defendants Wilkinson, LeBlanc, Wilson, and Padilla[22] maintain that they are entitled to qualified immunity as to the excessive-force and failure-to-intervene claims brought against them. (Doc. 79).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects all officials except "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[22] The failure-to-intervene claim against Officer Nelson is discussed *infra* because Officer Nelson filmed the events and did not actively take part in the use of force.

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Plaintiff does not dispute this requirement, which is clearly met. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To do so, the plaintiff must make a two-part showing. First, the plaintiff must present facts that make out a constitutional violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, the plaintiff must prove that the constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232.

a.    *Prong I: Constitutional Violation*

To establish a viable excessive force claim in the pretrial detainee context, a plaintiff must demonstrate that the use of force was "objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court must view the facts "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* The Court must also credit the government's need to manage the facility where an individual is detained and defer to policies and practices that jail officers believe are needed to preserve order, discipline, and security. *Id.*

Additional factors affecting the reasonableness of force used include:

[T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer

17

to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* A plaintiff can establish an excessive force claim by providing evidence that the challenged government conduct "is not rationally related to a legitimate government objective or that it is excessive in relation to that purpose." *Id.* at 2473–74.

In conducting this fact-specific inquiry, the Court views the facts in the light depicted by the video evidence and, where videos do not capture the facts in question, in the light most favorable to Plaintiff. Application of the *Kingsley* factors leads to the obvious conclusion that the Officer Defendants' use of force was unconstitutional.

The first factor emphatically favors Plaintiff. The Court cannot perceive even a rational need for force. Mr. Howard was isolated in a padded cell, "so the only possible threat [he] posed was to [himself]." *See Shuford v. Conway*, 666 F. App'x 811, 816 (11th Cir. 2016) (per curiam). The only evidence of a need to relocate Mr. Howard is Officer Padilla's vague assertion that medical personnel wanted him moved. Conversely, significant evidence shows jail personnel wanted Mr. Howard to stay put. Specifically, three day-shift medical staff agreed that Mr. Howard should not be moved by force and relayed this instruction to night-shift staff. Further, Nurse Martin told Officer Padilla in an "extensive[]" conversation that Mr. Howard should not be moved because of his mental state, age, and the prior use of force. But these concerns were ignored because Officer Padilla "had to do what he had to do." (Doc. 78-7, 57:18–22).

Whether the need for force was nonexistent or, in Defendants' best case, moderate, the amount of force used grossly exceeded this need. Officers pepper sprayed Mr. Howard, rushed him with over nine-hundred pounds of muscled Officers, and pinned him against the wall momentarily before turning and slamming him head first into the

ground, breaking his neck. The Officers then propped him up and, after Mr. Howard "refused" to walk, each grabbed an extremity and carried Mr. Howard, body limp and head dangling, to his new cell. There he was stripped naked and left on a concrete floor the rest of the night. All the while, Mr. Howard coughed, wheezed, and moaned in pain, stating at one point: "I'm dead. I'm dead." Thus, the first factor favors Plaintiff.

The second factor, the extent of the plaintiff's injury, likewise strongly supports Plaintiff. Defendants correctly concede this factor, but "believe this should be tempered due to the freak accident nature of the injury." (Doc. 79, p. 13). Nonsense. Three large corrections officers slammed a seventy-five-year-old man head first into hard ground. There is nothing "freak accident" about the injury. Rather, Mr. Howard's injury was the natural consequence of a grotesquely ill-conceived maneuver—it was as foreseeable as nightfall.

The third factor, officers' attempts to limit force, is mixed though it, too, favors Plaintiff. The Officers spent substantial time and energy trying to handcuff Mr. Howard at the door for a voluntary move, an effort also attempted by day-shift staff. Efforts at restraint, however, were quickly abandoned after Officers entered the cell and failed to immediately handcuff Mr. Howard. The penultimate head-first slam into the ground was anything but restrained.

The fourth factor, the severity of the security problem, weighs heavily for Plaintiff. Indeed, there was no security problem. There was purportedly a facilities management problem, which Defendants do not contend affected security. The Officer Defendants'

hypothetical problem that may have arisen "if a new [suicidal] inmate was admitted"[23] is unpersuasive. (Doc. 79, p. 14).

The fifth factor, Mr. Howard's perceived threat, likewise completely favors Plaintiff. Before he was moved, Plaintiff was isolated and could only threaten himself. He was also seventy-five-years old and would pose at most a minimal threat to the four younger, larger, and stronger Officers that moved him. In their motion, Defendants point to Officer Padilla's deposition testimony that "a partial handcuffing can turn the handcuffs into a weapon." (*Id.*). Which is to say, corrections officers may create a threat by arming a person with unsecured handcuffs to justify using force. The Court disagrees with Defendants' backwards reasoning.

The sixth factor, whether the detainee was actively resisting, is mixed. The Officers assert, "Mr. Howard 'actively resisted by tensing his muscles and attempting to pull away from our group,'" thus this factor favors the Officers. (*Id.*).[24] On the one hand, Mr. Howard was non-compliant; he did not put his hands through the food port to be handcuffed and seemingly made it difficult for Officers to secure his hands. On the other hand, he was

---

[23] Or, perhaps more accurately, if ten new suicidal inmates were admitted. *See supra* note 9.

[24] In a similar vein, in a different part of their motion, the Officer Defendants complain that Mr. Howard's failure to walk himself to his new cell after being tackled and handcuffed constituted continued resistance. (Doc. 79, p. 6 ("[H]e failed to [walk], keeping his body limp, thereby continuing to demonstrate resistance and frustrating the attempt to walk him across the room without further intervention."); *see also* Doc. 80, p. 10; Doc. 81, p. 10; Doc. 82, p. 11; Doc. 83, p. 10). Of course, his neck was broken so he couldn't. Counsel's inclusion of this "continuing resistance" argument in the Officer Defendants' motion is somewhere between absurd and callous. No wonder it was left out of Defendants' argument on this factor.

cowering in the corner when the Officers entered his cell, essentially blind due to pepper spray and glaucoma, and was under three Officers' control as soon as they reached him.

In light of these factors, and viewing the evidence in Plaintiff's favor, Plaintiff has established a Fourteenth Amendment violation. In sum, the Officers' conduct in pepper spraying an elderly detainee in an isolation cell, grabbing and slamming him head first into the ground breaking his neck, and then carrying his limp body, neck unsupported, to a new cell was "not rationally related to a legitimate government objective [and] . . . excessive in relation to th[e proffered] purpose." *See Kingsley*, 135 S. Ct. at 2473. This conclusion applies equally to the four Officers who jointly executed the use of force. Officer Padilla's responsibility stems from the directions he gave other Officers leading to and during the events, besides his participation in carrying Mr. Howard to the new cell. Officers Wilkinson's, LeBlanc's, and Wilson's respective responsibility derives from their actions executing the relocation.

The conclusion that the Officer Defendants' (excluding Officer Nelson) actions constitute excessive force is supported by a growing body of caselaw applying *Kingsley*. In *Shuford*, the Eleventh Circuit found that corrections officers used excessive force when they forcefully restrained compliant pretrial detainees, resulting in substantial injuries. 666 F. App'x at 816. A few facts guiding that court bear repeating here. For one, the "plaintiffs were in isolation holding cells so the only possible threat they posed was to themselves." *Id.* Also, the officers "used techniques that resulted in audible responses of pain from the plaintiffs." *Id.* To be sure, the facts in *Shuford* differed somewhat, but in both cases the force used by officers was vastly disproportionate to the need.

*Robinson v. Lambert*, 753 F. App'x 777 (11th Cir. 2018), lends additional support. There, a pretrial-detainee plaintiff refused repeated commands to attend a court hearing, prompting corrections officers to use force to compel his attendance. *Id.* at 778. Officers grabbed the plaintiff and slammed him against the wall, pinning him there for thirty to forty-five seconds before pushing him onto a desk and shoving him with enough force to break his arm. *Id.* at 779. On appeal, the Eleventh Circuit found that the unnecessary arm-breaking force used after officers had control over the plaintiff was objectively unreasonable. *Id.* at 780–81. Like the officers in *Lambert*, Defendant Officers grabbed a non-compliant detainee, Plaintiff, and had him under control for a few moments before escalating the force used by slamming Plaintiff into the ground, and then carrying his limp body out despite a broken neck. *See id.* Indeed, the force used here was arguably more outrageous than in *Lambert*. It is clear then that Plaintiff has established colorable excessive force claims against the first four Officer Defendants.

### b. Prong II: Clearly Established Right

Next, Plaintiff must show that the constitutional right violated was "clearly established" at the time of the incident. *Harlow*, 457 U.S. at 818; *Lee*, 284 F.3d at 1194. "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997). In assessing whether a right is clearly established, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, (2001), *overruled on other grounds by Pearson*, 555 U.S. 223.

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009). Here, neither party identifies factually indistinguishable case law, thus the question for the Court is whether Defendants' conduct violated Mr. Howard's constitutional rights "as a matter of obvious clarity." *See Robinson*, 753 F. App'x at 782.

"It is well established in [Eleventh Circuit] case law that an officer cannot continue to use force after there is no longer a need for it." *Robinson*, 753 F. App'x at 782 (citing *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991)). Concomitantly, where a detainee stops resisting—"whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated"—additional uses of substantial force against him are unconstitutional. *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010); *see also Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (affirming denial of police officers' qualified immunity where officers handcuffed the plaintiff and slammed his head into pavement and kicked his ribs).

The conduct of Officers Wilkinson, Wilson, LeBlanc, and Padilla violated clearly established law. Those Officers both secured Mr. Howard's compliance and incapacitated

him by, first blinding him with pepper spray,[25] then grabbing him by the arms and neck. After he was secured, the subsequent use of force—slamming Mr. Howard's head into the ground, breaking his neck, and then haphazardly moving his limp body to a new cell, where he was left naked on the floor all night—violated established law with obvious clarity. *See, e.g.*, *Danley*, 540 F.3d at 1309; *Burton*, 943 F.2d at 1576.

Viewing the evidence, and drawing reasonable inferences, in Plaintiff's favor, the Court finds the Officer Defendants' conduct was "so egregious that a constitutional right was clearly violated," case law aside. *See Lewis*, 561 F.3d 1291–92. The force used against Mr. Howard—who the Officers knew at the time was elderly and mentally unstable—grossly exceeded the need for force, evinced a disregard for Mr. Howard's safety, and, unsurprisingly given the circumstances, led to his death the next day. A reasonable officer engaging in the same conduct would have no doubts "that his conduct was unlawful." *See Saucier*, 533 U.S. at 202.

Defendants' arguments on clearly established law fail to move the needle. Notably, they go to great lengths to distinguish factually dissimilar cases, and don't bother to discuss whether their conduct violates general constitutional principles. (Doc. 79, pp. 9–12). Such attempts to distinguish damning case law and disarm by ignoring unfavorable precedent are unavailing.

---

[25] Pepper spraying Mr. Howard is especially shocking due to the fact that (1) his glaucoma meant his vision suffered even before the pepper spray, and (2) he was pepper sprayed earlier that day in connection with another cell move.

## 2. Qualified Immunity as to Officer Nelson

Next, the Officer Defendants' motion argues that Officer Nelson, who filmed the events with a handheld camera, is entitled to qualified immunity on the failure-to-intervene claim brought against him. (Doc. 79, pp. 16–18).

"[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Fundiller v. Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985). "But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so." *Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008) (finding that officer who witnessed fellow officer punch the plaintiff gratuitously was entitled qualified immunity where there was no evidence the onlooker officer "could have anticipated and then stopped" the punch).

Plaintiff has introduced sufficient evidence to support a reasonable jury finding that Officer Nelson's failure to intervene violated Mr. Howard's clearly established rights. Because Officer Nelson filmed the entire incident, including the moments before Officers entered Mr. Howard's cell, he "was in a position to intervene" on multiple occasions[26] but didn't. *See Hadley*, 526 F.3d at 1331.

---

[26] The Court identifies at least three separate moments in which Officer Nelson could have fulfilled his obligation to protect Mr. Howard from excessive force: (1) the moments after the decision was announced to forcefully remove Mr. Howard from his cell; (2) the moments after Mr. Howard is tackled to the floor, in which he is audibly coughing, wheezing, and says "I'm dead" twice; and (3) the moments after Officers prop up Mr. Howard's limp body from the floor and before the decision to carry him to the new cell.

Though the use of force began and ended within "mere moments"[27] (Doc. 79, p. 17), Defendants identify no minimum time-to-reflect threshold that must be exceeded to make out an actionable claim. And to the contrary, the Eleventh Circuit has denied qualified immunity to a police officer who watched fellow officers "attack" a plaintiff for "two or three minutes." *See Bailey v. City of Miami Beach*, 476 F. App'x 193, 196–97 (11th Cir. 2012) (per curiam); *see also Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (denying qualified immunity for onlooker police officer who watched police dog gratuitously attack the plaintiff for "as long as two minutes, which was long enough for a reasonable jury to conclude that the officer had time to intervene" (alterations accepted)). In the Court's view, the use of force against Mr. Howard did not happen so fast that Officer Nelson could not reasonably have intervened, thus Plaintiffs have made out a constitutional violation. *Cf. O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988) ("The three blows were struck in such rapid succession that [the officer defendant] had no realistic opportunity to attempt to prevent them."). On the last qualified immunity element, Officer Nelson's failure to intervene violated law clearly established at the time of the events. *See, e.g.*, *Bailey*, 476 F. App'x at 196; *Fundiller*, 777 F.2d at 1442.

**B.    Nurse Defendants' Motion for Summary Judgment**

Plaintiff brings 42 U.S.C. § 1983 claims against the Nurse Defendants based on a deliberate indifference theory. (Doc. 1). Each Nurse Defendant separately moves for summary judgment based on qualified immunity. (Docs. 80–83).

---

[27] Approximately sixty-five seconds elapsed between Officers entering Mr. Howard's cell and them dropping him in a new cell. (Video 2).

*1.  Legal Framework*

Deliberate indifference to a pretrial detainee's serious medical needs constitutes a Fourteenth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). To prevail on a deliberate-indifference claim, Plaintiff must show: "(1) [Mr. Howard had] a serious medical need; (2) the [Nurse Defendant's] deliberate indifference to that need; and (3) causation between that indifference and [Mr. Howard's] injury." *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).

On the first prong, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Alternatively, a medical need is serious where the delay in treatment "worsens the condition." *Id.* "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" *Id.* (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Inadvertent failures to furnish necessary medical treatment fall short of generating constitutional claims. The second prong therefore requires Plaintiff to establish: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Not that a defendant must know the precise nature of a detainee's injuries and ignore them to expose him or herself to liability. *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 252 (5th Cir. 2018) (concluding that courts do not require state officials to be warned of a "*specific* danger" to be held liable for deliberate indifference to a serious medical

need). "Liability can attach even if a prison official knows only that, if no action is taken, the detainee faces a 'substantial risk of serious harm.'" *Taylor v. Hughes*, 910 F.3d 729, 734 (11th Cir. 2019).

A jail official "disregards a serious risk by more than mere negligence 'when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate.'" *Dang ex rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425 (11th Cir. 1997)). A "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *Hill*, 40 F.3d at 1189. "A few hours' delay" in treating major injuries, like "broken bones [or] bleeding cuts may constitute deliberate indifference." *Harris v. Coweta Cty.*, 21 F.3d 388, 394 (11th Cir. 1994).

A deliberate indifference claim may be predicated on "a showing of grossly inadequate care [or] a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Likewise, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Dang*, 871 F.3d at 1280 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

### 2. Application

Viewing the evidence in the light most favorable to Plaintiff, none of the Nurse Defendants are entitled to summary judgment. The Court finds that the Nurse Defendants violated Mr. Howard's clearly established constitutional rights based on their deliberate indifference to his serious medical need.

On the first prong, the objectively serious medical need element, Plaintiff easily met this burden by showing that Mr. Howard died from "hypoxic encephalopathy due to a neck fracture with cervical spinal cord trauma, which was due to blunt force." *See, e.g.*, *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir.1990) (painful broken foot can be serious medical need); (Doc. 99-6, p. 4). That Mr. Howard's injuries constitute an objectively serious medical need is beyond reasonable debate.

On the second prong, the subjective component, a reasonable jury could likewise find that each Nurse Defendant, having conducted an assessment of some sort on Mr. Howard post-use of force, had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than mere negligence. *See Brown*, 387 F.3d 1344, 1351.[28]

As to Nurses Martin and Mendoza, both were called to evaluate Mr. Howard immediately after the use of force, were told he was taken down, and observed him lying naked on the concrete floor, struggling to move his arms and not moving his legs.[29]

---

[28] *See also McElligott*, 182 F.3d at 1256–58 (finding viable deliberate-indifference claims against jail-employed doctor and nurse who, despite receiving pain complaints from detainee, failed to pursue "further diagnosis of and treatment for the severe pain [the plaintiff] was experiencing"); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 702, 704 (11th Cir. 1985) (holding the plaintiff established valid deliberate-indifference claims against medical personnel who "did little or nothing to evaluate the medical needs of" a detainee who complained of serious problems associated with his leukemia).

[29] Though Nurse Mendoza maintains that she observed Mr. Howard easily moving his arms and legs after the use of force, the Court relies on the video evidence that refutes her claim. *See Bodden v. Bodden*, 510 F. App'x 850, 852 n.2 (11th Cir. 2013) (per curiam) ("We need not adopt the non-moving party's version of the facts to the extent it is clearly contradicted by a videotape such that no reasonable jury could believe it."). Defense Counsel decision to repeat Nurse Mendoza's demonstrably false version of events in her motion (Doc. 83, p. 20) is baffling.

Likewise, both remained present when Mr. Howard told officers he could not get up or move his legs, and were aware that he spent the night naked on the floor, mere feet from his empty cot. Despite ample opportunity to enter Mr. Howard's cell and begin care or at least conduct an up-close evaluation in the face of an obvious need, they watched him struggle on the ground for minutes and then walked away. The evidence is more than sufficient to support a reasonable jury finding that Nurses Martin and Mendoza acted with deliberate indifference to Mr. Howard's serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (explaining that knowledge of the risk of serious harm may be established by "inference[s] from circumstantial evidence" or "from the very fact that the risk was obvious"); *Dang*, 871 F.3d at 1280; *supra* note 28.

The Court reaches the same conclusion as to Nurse Gray—she disregarded a known serious risk of harm by conduct exceeding mere negligence. Nurse Gray knew about the use of force, observed Mr. Howard naked on his cell floor, learned that he could not sit up unassisted, and failed to meaningfully act on his complaints of neck and back pain. She saw that Mr. Howard needed to be physically lifted into his cot and handed his lunch because he couldn't reach a sandwich three feet away. Drawing all reasonable conclusions in Plaintiff's favor, there is ample evidence to support a reasonable jury finding that Nurse Gray had subjective knowledge of the substantial risk of serious harm to Mr. Howard and effectively disregarded that risk by providing cursory treatment. *See Farmer*, 511 U.S. 842; *Dang*, 871 F.3d at 1280; *supra* note 28.

The question of Nurse Distin's possible culpability is the closest. She, too, observed Mr. Howard on November 19 and learned that he could not sit up or move his legs. Armed with this information, she administered eye drops and decided not to inquire

further or declare a medical emergency, and instead merely reported the complaint to Nurse Martin. Hours later, Nurse Distin found Mr. Howard unresponsive, and he died soon after. In the Court's view, a patient's complaints that he or she cannot sit up or move his or her legs evinces a need "that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Hill*, 40 F.3d at 1187. Nurse Distin was subjectively aware of this need because Mr. Howard reported it to her, and, accepting Plaintiff's version of the facts, she essentially ignored it and failed to even report his symptoms to emergency responders. These facts are enough for a jury to conclude that Nurse Distin disregarded a known risk of serious harm by conduct exceeding mere negligence. *See Farmer*, 511 U.S. 842; *Dang*, 871 F.3d at 1280; *supra* note 28.

The right violated by each Nurse Defendant was clearly established, as "a reasonable person would have known" that delaying treatment of a seriously injured neck "would detrimentally exacerbate the medical problem." *See Valderrama v. Rousseau*, 780 F.3d 1108, 1121 (11th Cir. 2015) ("[I]t is 'clearly established . . . that an official acts with deliberate indifference when he intentionally delays providing . . . access to medical treatment, knowing that the [detainee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."); *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1235 (11th Cir. 2010).

In sum, each nurse that interacted with Mr. Howard learned that he could not move his legs and was experiencing neck and back pain. Some saw him naked on the ground, writhing in pain with his still-functioning arms; others viewed him while standing next to his cot (from which he did not rise once being placed there) and heard his complaints. Yet not one of them made a meaningful effort to examine the source of his pain—his

broken neck—with a potentially life-saving x-ray or even manual manipulation. Instead, he received superficial treatment and eventually died from a neck fracture, untreated for approximately twenty-four hours. Plaintiff's claims against the Nurse Defendants survive.

## C. Orange County's Motion for Summary Judgment

Finally, in a separately filed motion, the County moves for summary judgment as to Counts X and XII. (Doc. 77).

### 1. Count X: Deliberate Indifference

Count X brings a *Monell* claim against the County pursuant to 42 U.S.C. § 1983. (Doc. 1, ¶¶ 97–100). Plaintiff maintains that liability should be imposed on the County because it "delegated final decision-making authority to [Nurse] Martin for performing post-use of force assessments." (Doc. 97, p. 11). In support, Plaintiff emphasizes that: (i) Nurse Martin had no oversight in making medical decisions at night because his supervisors did not work nights (Doc. 99-3, 96:5–16); (ii) County regulations conferred on Nurse Martin complete discretion in conducting post-use of force evaluations and did not provide training on performing same or documenting results (*Id.* 10:1–11:18); (iii) Nurse Martin was not required to report post-use of force assessments to a supervisor or fill out a medical form specific to uses of force—though a special form is required when pepper spray is deployed (Doc. 78-7, 43:18–46:2).

The County argues that Nurse Martin lacked final policymaking authority, so the County may not be held liable for his actions. (Doc. 102, pp. 3–6). For its part, the County highlights that Nurse Martin is not a "medical director," that Dr. Buck retained his supervisory authority over medical staff, that County policies bound Nurse Martin to be

licensed and provide satisfactory care, and that Nurse Martin was fired for violating policy. (Doc. 102, pp. 3–6).

A plaintiff may recover against a municipality under § 1983 if "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Conversely, a municipality is never liable under the doctrine of *respondeat superior. Id.* A municipal official's decisions constitute "official municipal policy" where the official in question is "responsible for establishing final government policy respecting such activity." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004). "[W]hether a particular official has 'final policymaking authority' is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). In making this determination, courts are to consider not only statutes and caselaw, but also "relevant customs and practices having the force of law." *Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989).

An official is not a final policymaker where his or her decisions are subject to "meaningful administrative review." *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997). However, a plaintiff may prevail against a municipality that delegates final policymaking authority to an otherwise non-final policymaker. "[T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Mandel*, 888 F.2d at 792.

In *Mandel*, the Eleventh Circuit found that a county government delegated final policymaking authority to a physician's assistant regarding medical care for prison inmates. *Id.* at 794. The court explained:

> Hatfield was acting as the final policymaker for the County with respect to the medical affairs at the road prison. The County had entered into a Memorandum of Understanding with the health department and had established a policy that medical care for inmates at the road prison would be provided by a physician's assistant. Hatfield was that physician's assistant. Although it was initially contemplated that the physician's assistant would be supervised by a medical doctor, the evidence revealed that a custom and practice developed so that the policy was that Hatfield was authorized to function without any supervision or review at all. The policy was that Hatfield's medical decisions were subject to no supervision or review, except to the extent that Hatfield himself, in his sole and unsupervised discretion, deemed appropriate. We agree with the district court that Hatfield was the sole and final policymaker with respect to medical affairs at the road prison.

*Id.*

Since *Mandel*, courts have found that medical officials with vast authority and discretion in administering care at penal institutions are final policymakers under a delegation theory. For instance, in *Kimbrough v. City of Cocoa*, No. 6:05-cv-471-Orl-31KRS, 2006 WL 2860926 (M.D. Fla. Oct. 4, 2006), the court found:

> Norgell's actions as the Medical Director for BCDC[] are enough to establish PHS' liability under § 1983. It is clear from the testimony of the parties that Norgell had final policymaking authority with regard to medical decisions at BCDC and was not subject to any sort of meaningful administrative review. Norgell testified that she did not have to get approval to send patients to the emergency room or get STAT blood work, but would only request approval for something "unusual." There is no apparent oversight for her decisions *not* to send patients out for additional procedures. There are several examples in this situation of Norgell acting on her own initiative, as well as approving the actions of Latier and Wood. Norgell was involved in Kimbrough's case from beginning to end, first by ordering Latier to prescribe Tylenol, and finally by ordering Wood to conduct a urinalysis on December 3rd. Norgell also had direct contact with Kimbrough at least twice during his stay at BCDC. PHS is liable for all deliberately indifferent acts and decisions made by its final policymakers which result in violations of the constitutional

rights of inmates. Therefore, it is unnecessary for Plaintiffs to demonstrate a "custom or policy" in this case.

*Id.* at *5.

Here, viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in its favor, the Court finds that the County delegated final policymaking authority to Nurse Martin with respect to medical decisions relating to uses of force at the Jail. The County's policies did not constrain Nurse Martin, as they merely required "an assessment" and some sort of documentation following uses of force. *See Mandel*, 888 F.2d at 792; (Doc. 99-3, 10:3–25, 11:12–18). Although Nurse Martin formally had supervisors, a custom developed such that his medical decisions were not subject to meaningful administrative review. *See Mandel*, 888 F.2d at 794; *Kimbrough*, 2006 WL 2860926, at *5. There is no evidence Nurse Martin needed approval for treatment decisions after uses of force, nor is there evidence of oversight for decisions to order or not order additional procedures. *See Kimbrough*, 2006 WL 2860926, at *5. As in *Kimbrough*, there are examples of Nurse Martin "acting on h[is] own initiative, as well as approving the actions of [Nurses Mendoza, Gray, and Distin]." *See id.* Nurse Martin likewise had direct contact with Mr. Howard numerous times and was involved supervising care throughout Mr. Howard's stay at the Jail. *See id.* Accordingly, the Court finds that the County effectively delegated final policymaking authority to Nurse Martin with respect to post-use of force care at the Jail.

The Court rejects the County's contrary arguments. Dr. Buck's declaration that he "was responsible for the review of medical care administered to the inmates" at the Jail (Doc. 78-21, ¶ 6) is contradicted by myriad deposition testimony and numerous instances of unsupervised medical treatment. The County's argument that "established policies and

procedures" constrained nurses' discretion (Doc. 77, p. 18) is belied by the vague and standard-less policies that applied to nurses treating inmates after uses of force at the time of the incident. The County strains, imploring that while nurses have discretion, they "are obligated to stabilize obvious injuries and act in an emergency." (*Id.* at p. 20). The County, and many officials who testified, pay this "obligation" lip service; the evidence shows twenty-four hours of corrections and medical officers utterly ignoring "obvious injuries and [failing to] act in an emergency." (*See id.*). Finally, the fact that Nurse Martin was terminated after Mr. Howard's death has little bearing on the question of whether his decisions were subject to meaningful review before it. (*See* Doc. 203, p. 6).[30]

### 2.   *Count XII: Negligent Hiring and Retention*

Count XII avers a claim against the County for negligently hiring and retaining Officer Padilla. (Doc. 1, ¶¶ 106–14). Plaintiff cites four "complaints regarding violence and other misconduct" between 2010 and 2014 to support this claim. (Doc. 97, pp. 3–4).[31] Based on Officer Padilla's purported violent background, Plaintiff maintains that the

---

[30]  The County's attempts to distinguish *Mandel* and *Kimbrough* are likewise unavailing. While the circumstances that led a physician's assistant to operate without review in *Mandel* differ from the facts here, the result—basically a nurse in charge of treatment decisions without meaningful oversight—is the same. Also, the County argues that the official delegated final policymaking authority in *Kimbrough* was a "medical director," thus the County seems to divine a rule that only medical directors may be delegated final authority. Of course, the County offers no legal support for such a rule, and regardless the *Mandel* decision disproves it.

[31]  These include an arrest based on aggravated assault allegations (Doc. 78-13, 18:14–20:13; Doc. 78-15, p. 117), a written reprimand by the Jail for failing to report a use of force (Doc. 78-15, pp. 118–141), a fourteen-day domestic violence injunction that the County did not document in Officer Padilla's employee file (Doc. 78-13, 52:15–55:20), and allegations of unauthorized uses of force against detainees, which were investigated and "not sustained" (Doc. 78-15, pp. 150–164).

County was negligent in retaining and promoting Officer Padilla. (Doc. 97, p. 18). The County seeks summary judgment on this claim. (Doc. 77).

"Negligent retention occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicate his unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment." *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1378 (S.D. Fla. 2013). "Only when an employer has somehow been responsible for bringing a third person into contact with an employee, whom the employer knows or should have known is predisposed to committing a wrong under circumstances that create an opportunity or enticement to commit such a wrong, should the law impose liability on the employer." *Garcia v. Duffy*, 492 So. 2d 435, 439 (Fla. 2d DCA 1986).

Plaintiff has failed to introduce sufficient evidence to survive summary judgment on this claim. First, the two "violent actions" that occurred at the jail were both investigated; the first lead to a reprimand and the second was unsubstantiated. These exercises of supervision and punishment contradict Plaintiff's contention that the County "fail[ed] to take further action such as investigation[.]" *See Shehada*, 965 F. Supp. 2d at 1378. Furthermore, there is no evidence that the County was aware, or should have become aware, of the domestic violence injunction. *See id.* Finally, the remaining supposed violent action was an arrest based on aggravated assault investigations, which apparently did not lead to a conviction. These proffered incidents are insufficient to convey actual or constructive notice to the County that Officer Padilla "is predisposed to committing a [violent] wrong," triggering a duty to act to protect detainees. *See Garcia*, 492 So. 2d at 438. Thus, the County is entitled to summary judgment as to Count XII.

### D.    Mrs. Howard's Individual Claim

Defendants also move for summary judgment on Plaintiff Carolyn Howard's individual capacity claim. (Doc. 79, pp. 3–4). On April 2, 2018, the Court granted in part Defendants' dismissal motion and dismissed the individual capacity claims brought by Mr. Howard's children, but did not address Mrs. Howard's individual capacity claim. (Doc. 60, pp. 10–11). Defendants are correct in this instance, and Mrs. Howard's individual capacity claims are therefore due to be dismissed.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Orange County's Motion for Summary Judgment (Doc. 77) is **GRANTED IN PART** and **DENIED IN PART**.

    a. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant, Orange County, and against Plaintiff, as to Count XII only.

    b. In all other respects, the County's Motion is **DENIED**.

2. Officer-Defendants' Motion for Summary Judgment (Doc. 79) is **GRANTED IN PART** and **DENIED IN PART**.

    a. Plaintiff Carolyn Howard, in her individual capacity, is **DISMISSED** from this action.

    b. In all other respects, the Officer-Defendants' Motion is **DENIED**.

3. Nurse-Defendants' Motions for Summary Judgment (Docs. 80–83) are **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on May 17, 2019.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties